DREW, J.
 

 Lin this workers’ compensation matter, Nabors Drilling USA, LP, appeals a judgment ordering it to reinstate temporary total disability (“TTD”) benefits, reimburse the claimant for out-of-pocket medical expenses, pay for additional medical treatment ordered by the treating orthopedic surgeon, and to pay penalties, attorney fees, and litigation expenses.
 

 We affirm.
 

 FACTS
 

 Buddy Whatley was employed as a driller on a rig operated by Nabors in Webster Parish, Louisiana. Whatley was injured on June 4, 2006, when blocks on the rig fell and caused a console to smash against a brake handle that Whatley was holding with his right hand. The impact knocked Whatley back 10 feet and against a structure on the rig. Whatley was left momentarily unconscious, his right index finger at the DIP joint and his right ring finger at the PIP joint were amputated, and his right little finger was partially amputated with only soft tissue holding the distal part of the finger in place. Whatley was transported by helicopter to LSUHSC
 
 *256
 
 in Shreveport for emergency medical treatment.
 

 Whatley, a Texas resident, began receiving workers’ compensation benefits under Texas law. Whatley filed a disputed claim for compensation form in Louisiana on March 12, 2007. The next month, the WCJ granted Whatley’s motion for an expedited hearing and ordered that Dr. William Donovan was to be Whatley’s choice of physician.
 

 12In April 2007, Whatley filed an amended disputed claim for compensation form, which asserted that indemnity benefits were still not being paid pursuant to Louisiana law as they were being paid under Texas law at the wrong rate.
 

 On April 26, 2007, FARA, the third-party administrator in Texas, gave notice to Whatley that because he was electing to continue his compensation claim in Louisiana, further benefits were not owed in Texas.
 

 At the end of April 2007, Whatley amended his disputed claim for compensation form a second time. He asserted that he sustained additional physical injuries to his back, knee, and shoulder; sustained a physical-mental injury; and was entitled to penalties and attorney fees for denial of medical treatment, underpayment of indemnity benefits, and nonpayment of medical bills.
 

 In May of 2007, Whatley began receiving Louisiana weekly TTD benefits of $454. Nabors agreed that Whatley had been eligible for the $454 weekly rate since March of that year.
 

 On September 4, 2007, Whatley was examined by Dr. Robert Holladay, an orthopedic surgeon, for an independent medical examination. Dr. Holladay concluded that Whatley was at maximum medical improvement (“MMI”) for his right hand and fingers, right knee, C-spine, and L-spine. Dr. Holladay did not think Whatley was at MMI for the T-spine because he recommended a facet injection in this area.
 

 On February 4, 2008, Dr. Holladay wrote to Nabors’ counsel that he had reviewed a driller job description and the results of a Functional [ ^Capacity Evaluation (“FCE”), and he felt that the restrictions recommended in the FCE would permit Whatley to return to the position of driller. On March 24, 2008, Nabors terminated Whatley’s indemnity benefits.
 

 Following a trial on the merits, the WCJ concluded that: (1) Whatley suffered an accident as defined by the Louisiana Workers’ Compensation Act and was temporarily and totally disabled as a result of the accident; (2) Whatley was entitled to all applicable comp benefits including mileage reimbursement; (3) TTD benefits should be reinstated from March 24, 2008; (4) the medical treatment recommended by orthopedic surgeon Dr. Kenneth Berliner was approved; (5) Whatley was to be reimbursed for all his out-of-pocket medical expenses; (6) a recommended urological consult was approved; (7) Nabors was assessed a penalty of $4,000 for its arbitrary and capricious discontinuance of indemnity benefits; (8) Nabors was assessed a penalty of $8,000 for its arbitrary and capricious denial of procedures and treatments recommended by Dr. Berliner; and (9) What-ley was entitled to attorney fees of $11,500, litigation expenses of $5,477.47, and legal interest on awards from the date of judicial demand.
 

 Nabors argues on appeal that the WCJ erred in awarding further TTD benefits, further medical benefits, penalties, and attorney fees.
 

 REINSTATEMENT OF TTD BENEFITS
 

 Dr. Shaw
 

 Dr. Timothy Shaw began treating What-ley after the accident for right knee pain.
 
 *257
 
 Dr. Shaw’s diagnosis was a probable MCL sprain. An MRI |4of the right knee performed in September of 2006 as ordered by Dr. Shaw showed a small joint effusion.
 

 Dr. Rodriguez
 

 Dr. Jose Rodriguez, an orthopedic and spinal surgery specialist, examined What-ley in June of 2006. Whatley’s chief complaints at the time concerned his right hand, right knee, and lower back pain. Dr. Rodriguez’s impressions were lumbar spine sprain and right knee contusion.
 

 Dr. Gabel
 

 Dr. Gerard Gabel examined Whatley on June 28, 2006 on a referral for treatment of his right hand.
 
 [1]
 
 Whatley underwent therapy for his hand in July and August of 2006.
 

 Whatley was advised by Dr. Gabel in August 2006 that the only thing that might prove beneficial for his right hand was a PIP fusion of the little finger. The next month, Whatley agreed to have the fusion procedure performed, but then later changed his mind. Dr. Gabel thought that Whatley was at MMI with the hand and gave him a 25% upper extremity and 15% total body permanent impairment.
 

 When Dr. Gabel treated Whatley on January 23, 2007, it was noted that What-ley’s little finger was essentially nonfunctional. The PIP fusion was performed by Dr. Gabel at the end of that month.
 

 Dr. Donovan
 

 Dr. William Donovan examined Whatley on March 6, 2007. Whatley complained of constant pain to the posterior part of the neck that radiated pinto both arms and interscapular region; headaches associated with the neck pain; pain to the dorsal spine; right knee pain; right hand pain; and low back pain that radiated into both legs.
 

 Dr. Donovan recommended that What-ley undergo MRIs of the right knee and cervical, dorsal, and lumbar spines; x-rays of the cervical and lumbar spines; and neurological testing with EMG and NCV to the spine.
 
 [2]
 
 Dr. Donovan concluded that Whatley was not at MMI and was unable to work.
 

 Dr. Berliner
 

 Because Dr. Donovan was about to retire and accepting no new patients, he referred Whatley to orthopedic surgeon Dr. Berliner. On May 16, 2007, Whatley gave Dr. Berliner a case history of right hand pain, cervical pain that radiated to the left shoulder, right knee pain with difficulty bending, and lumbar pain that radiated to his buttocks with muscle spasms. Dr. Berliner’s impressions were medial collateral ligament sprain in the right knee, cervical strain with possible disc herniation, and lumbar strain with possible disc herniation.
 
 [3]
 

 Dr. Berliner wanted MRIs of the cervical, thoracic and lumbar spines. These MRIs were done on June 16, 2007. The radiologist’s impressions were:
 

 • C-spine: Mild central spinal stenosis at C6-7, and mild central spinal stenosis and bilateral foraminal stenosis at C3-4.
 

 
 *258
 
 le,» L-spine: Moderate arachnoiditis, multilevel annular disc bulges with no significant central stenosis, and moderate bilateral foraminal stenosis at L3-4 and L4-5 that could affect the existing L3 and L4 nerve roots.
 

 • T-spine: Multiple small annular disc bulges, but no thoracic herniation; and no focal site of nerve root encroachment was identified.
 

 Dr. Berliner next treated Whatley on July 2, 2007. The complaints at the time were of constant neck pain, neck spasms, pain in the trapezius and shoulder area, pain in the back with intermittent numbness in the right thigh, and right knee pain. Dr. Berliner’s diagnosed multilevel cervical, thoracic, and lumbar disc bulges, and a medial collateral ligament sprain in the right knee. Dr. Berliner recommended that Whatley l’eceive a cervical epidural block at C6-7.
 

 Dr. Likover
 

 Dr. Larry Likover, an orthopedic surgeon, examined Whatley on June 21, 2007, on behalf of Nabors. Dr. Likover noted that Whatley complained that his neck and back pain made him disabled. He found Whatley at MMI in his hand and fingers.
 

 After examining the spinal MRIs, Dr. Likover opined that Whatley likely had multilevel degenerative disc disease in the cervical, lumbar, and thoracic spines.
 
 [4]
 
 Dr. Likover stated that he found no evidence of a surgical problem in the neck or low back, and found nothing objective that substantiated Whatley’s complaints of disabling pain in the neck or back. Dr. Likover concluded that Whatley was at MMI from whatever injury |7occurred to the neck or low back, which was most likely a sprain or strain if any injury had occurred.
 

 Dr. Holladay
 

 On September 4, 2007, Whatley was examined by orthopedic surgeon Dr. Robert Holladay for an independent medical examination. Whatley’s chief complaints were neck pain between the shoulders, upper back pain, occasional low back pain, and right hand pain. The upper back pain was the primary complaint.
 

 After reviewing MRIs of the spine, Dr. Holladay concluded there were no frac-toes, dislocations, or evidence of acute disc herniations. He thought the MRI of the C-spine showed degenerative disc disease changes consistent with Whatley’s age, the MRI of the T-spine showed mild degenerative disc disease change, and the MRI of the L-spine showed multilevel degenerative disc disease.
 

 Dr. Holladay noted there were no symptoms elicited by history that were consistent with spinal stenosis. He disagreed with Dr. Berliner’s recommendation for epidural steroid injections because there were no signs or symptoms consistent with radiculopathy in any of the spine areas.
 
 [5]
 
 He also found no indications for surgical intervention or management of any of the spine areas. Accordingly, Dr. Holladay recommended that Whatley receive facet injections in the mid to lower thoracic spine bilaterally. If these injections changed or modified the upper spine complaints to a ^significant degree, then Dr. Holladay would consider another round of injections.
 

 
 *259
 
 Dr. Holladay diagnosed a contusion of the right medial knee, and strain and sprain of the cervical, thoracic, and lumbar spines. He thought the right hand and fingers were at MMI. He believed the right knee was also at MMI, with his only concern regarding knee restrictions being that the right leg could buckle if Whatley were to stand on only that leg.
 

 With respect to the cervical and lumbar spines, Dr. Holladay believed Whatley was at MMI and he did not place any work restrictions on him concerning these spines. However, with respect to the thoracic spine, Dr. Holladay did not believe that Whatley was at MMI and recommended the facet injection; this position would later change.
 

 ER Visit
 

 Whatley went to the emergency room at Memorial Medical Center in Livingston, Texas, on October 7, 2007, with complaints of back pain. The diagnosis was lumbosa-cral neuritis. An x-ray of the C-spine showed retrolisthesis at C3 and C4. An x-ray of T-spine was negative.
 

 FCE
 

 A functional capacity evaluation (“FCE”) was performed on December 20, 2007. It was determined that Whatley could work at a medium work level, with a limit of lifting no more than 50 pounds, and no more than 30 pounds on a frequent basis.
 

 |
 
 ,,Dr. Berliner (Continued)
 

 On October 11, 2007, Whatley complained to Dr. Berliner about pain in the neck with pain down his right arm to his fingers, low back pain with pain down his right leg, and right knee pain.
 

 Dr. Berliner noted on December 7, 2007, that it was his impression that Whatley had cervical disc protrusions with some evidence of radiculopathy. He felt that if the thoracic facet injections did not help Whatley, then pathology from the cervical spine should be considered. He also thought that an EMG of the upper extremities would document cervical radiculopa-thy if it was present.
 

 On March 7, 2008, Dr. Berliner gave Whatley facet injections at right and left T7-8, T8-9, T9-10, and T10-11. In a report five days later, Dr. Berliner wrote that the facet injections were only partly helpful as Whatley remained symptomatic; that Whatley was to continue with his anti-inflammatories and other symptomatic medications; that he wanted Whatley to go through a course of postinjection physical therapy; and that he was to monitor Whatley’s progress with the injections and see him again in four weeks, when he would assess if the injections helped or if the thoracic symptoms were only part of the entire clinical picture.
 

 On April 3, 2008, Dr. Larry Stokes, a rehabilitation counselor, wrote to Dr. Berliner requesting that the doctor comment on Whatley’s physical ability to perform jobs that had been identified for Whatley, such as cashier positions, pizza team member, and delivery driver. Dr. Berliner noted that 1 ]0Whatley was physically incapable of performing any of these jobs. Dr. Jose Rodriguez approved the jobs.
 

 An injured employee seeking TTD benefits must prove by clear and convincing evidence that he is physically unable to engage in any employment, regardless of its nature, including employment while working in pain. La. R.S. 23:1221(1);
 
 Lewis v. Chateau D’Arbonne Nurse Care Center,
 
 38,394 (La.App.2d Cir.4/7/04), 870 So.2d 515. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable,
 
 ie.,
 
 much more probable than its nonexistence.
 
 Id.
 
 A claimant may prove disability through medical and lay testimony. The WCJ must weigh all of
 
 *260
 
 the evidence to determine if the claimant has met his burden of proving temporary total disability.
 
 Id.
 

 An award of benefits based on TTD shall cease when the physical condition of the employee has resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee may be made and the employee’s physical condition has improved to the point that continued, regular treatment by a physician is not required. La. R.S. 23:1221(l)(d).
 

 Factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of appellate review.
 
 Banks v. Industrial Roofing & Sheet Metal Works, Inc.,
 
 96-2840 (La.7/1/97), 696 So.2d 561. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one.
 
 Id.
 
 When there Inis a conflict in the testimony, reasonable evaluations of credibility, and reasonable inferences of fact should not be disturbed even though the appellate court may feel that its own inferences and evaluations are as reasonable.
 
 Rosell v. ESCO,
 
 549 So.2d 840 (La.1989);
 
 Arceneaux v. Domingue,
 
 365 So.2d 1330 (La.1978). Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Stobart v. State through Dept. of Transp. and Development,
 
 617 So.2d 880 (La.1993).
 

 Dr. Likover thought that Whatley could return to his job as a driller without any restriction, as he pointed out that he knew of many men with amputations of Whatley’s type who returned to work as drillers or oh rig workers. Dr. Likover testified that he had been on drilling rigs many times, so he was familiar with what a driller does. Dr. Likover testified that he felt Whatley could work on a rig even with fingers missing. The WCJ found it suspect that Dr. Likover would not even give restrictions that took into account the right hand issues.
 

 Dr. Holladay testified that as a broad general statement, he agreed with Dr. Lik-over that workers with a single digit amputation often return to the oilfields, but would take exception to that statement as applied to someone with amputations of multiple digits on the dominant hand. Whatley’s amputated and partially-amputated fingers were on his dominant hand.
 

 Dr. Holladay testified in his November 2007 deposition that he would not recommend that Whatley return to work at that time because his upper 112back still needed attention. Dr. Holladay considered What-ley to be disabled from doing the job of a driller until the thoracic facet injections were done.
 
 [6]
 
 However, after reviewing a driller job description and the FCE, Dr. Holladay wrote on February 4, 2008, that he felt that the restrictions recommended in the FCE would permit Whatley to return to the position of driller.
 

 Dr. Berliner, who is Whatley’s treating physician, testified that he still believed that Whatley should remain off work. The job description for the driller position states that the job involved heavy labor-intensive work.
 

 After examining the C-spine MRI, Dr. Berliner thought there was significantly more pathology at the C6-7 level than at any other level, and this pathology appeared to him to be post-traumatic. Dr. Likover strongly disagreed with Dr. Ber
 
 *261
 
 liner’s position that there was significantly more pathology at the C6-7 level than at the other levels.
 

 Whatley testified that he still had trouble with pain in his back and shoulders every day. He agreed that his neck and lower back were not giving him problems. Whatley stated that he had never heard of anyone at Nabors being offered a modified driller job, and he denied ever being offered such a position that took into account the restrictions of the FCE.
 

 Whatley did not think he would be able to fulfill his job duties as a driller. He described the job as requiring him to, for example, stand at the drill console, do his helper’s jobs to show them how to do them properly, |13pull levers, turn on pumps, control a hand brake and foot throttle, open and shut valves, and lift between 10 and 150 pounds. His helpers and machinery were available to help lift heavy objects.
 

 Based upon our review of the record, we cannot conclude that the WCJ was clearly wrong in ordering the reinstatement of TTD benefits.
 

 PENALTY-TERMINATION OF TTD BENEFITS
 

 The WCJ found that Nabors was arbitrary and capricious in stopping wage benefits and assessed a penalty of $4,000. La. R..S. 23:1201(1) provides, in part:
 

 Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of a penalty not to exceed eight thousand dollars and a reasonable attorney fee for the prosecution and collection of such claims.
 

 Penalties are
 
 stricti juris
 
 and should be imposed only when the facts clearly negate good faith and just cause in connection with the refusal to pay.
 
 Young v. Christus Schumpert Medical Center,
 
 39,593 (La.App.2d Cir.5/11/05), 902 So.2d 1180;
 
 Lee v. Schumpert,
 
 36,733 (La.App.2d Cir.1/29/03), 836 So.2d 1214. Nevertheless, a WCJ has great discretion in awarding or denying penalties and attorney fees.
 
 Nowlin v. Breck Const. Co.,
 
 30,622 (La.App.2d Cir.6/24/98), 715 So.2d 112.
 

 Nabors terminated indemnity payment in March 2008 while relying on the positions of Drs. Holladay and Likover.
 

 On January 10, 2008, Dr. Likover wrote to Nabors’ counsel that after reviewing the FCE, he disagreed with its conclusion that Whatley could only do medium duty work, as he believed that Whatley could do heavy | |.|duty work. Dr. Likover thought there was no objective basis to restrict Whatley from returning to full duty work as a driller.
 

 On February 4, 2008, Dr. Holladay wrote to Nabors’ counsel that he had reviewed the driller job description and the FCE, and he felt that the restrictions recommended in the FCE would permit Whatley to return to the position of driller. Dr. Holladay later wrote that returning to work would be a form of physical therapy for Whatley.
 

 Whatley testified that he never received anything in writing stating that he was being offered a modified driller position. In addition, he was never contacted by Nabors and told they would work with him in accordance with the recommendations of the FCE.
 

 Joseph Sarkies, the claims adjuster working on the case, testified that Nabors’ direct superintendent over the East Texas division said he would rehire Whatley in a modified driller position. Sarkies did not
 
 *262
 
 personally offer the modified driller job to Whatley. He was not sure of the exact modifications to the job. Sarkies also stated that Dr. Holladay was never presented with a modified driller job description.
 

 Finally, we note that indemnity benefits were terminated in March 2008. It was not until the next month that Dr. Stokes received approval from Dr. Rodriguez for the various jobs that Dr. Stokes identified for Whatley.
 

 The WCJ did not abuse his discretion in assessing a $4,000 penalty for Nabors’ arbitrary and capricious termination of TTD benefits.
 

 J^FURTHER MEDICAL BENEFITS
 

 Under La. R.S. 23:1203, medical payments are separate and distinct from compensation indemnity benefits. A workers’ compensation claimant may recover medical expenses that are reasonably necessary for the treatment of a medical condition caused by a work-related injury. The plaintiff must prove the necessity of the treatment and the causal connection between the treatment and the employment-related accident by a preponderance of the evidence.
 
 Taylor v. Wal-Mart Stores, Inc.,
 
 40,179 (La.App.2d Cir.9/21/05), 914 So.2d 579,
 
 writ not considered,
 
 2006-0144 (La.4/17/06), 926 So.2d 500,
 
 cert. denied,
 
 549 U.S. 1157, 127 S.Ct. 982, 166 L.Ed.2d 783 (2007).
 

 A WCJ’s determination with regard to medical necessity is entitled to great weight and will not be disturbed on appeal in the absence of manifest error or unless clearly wrong.
 
 City of Shreveport v. Casciola,
 
 43,132 (La.App.2d Cir.3/26/08), 980 So.2d 203.
 

 The WCJ found that the medical treatment recommended by Dr. Berliner was reasonably necessary under the circumstances. As noted by the WCJ, Dr. Berliner had recommended additional diagnostic testing, cervical blocks, physical therapy, prescription medications, and additional examinations. The WCJ also ordered reimbursement of any and all medical expenses that Whatley had paid out of pocket, as well as mileage reimbursement.
 

 In October 2007, Dr. Berliner sought approval for nerve conduction and EMG studies of the upper and lower extremities. Following the facet | l(imjections, Dr. Berliner prescribed four weeks of back program physical therapy.
 

 Dr. Likover did not believe that Whatley needed any additional medical care for a condition related to his accident. He thought that the facet injections were offered to treat the subjective complaints based on arthritis or degenerative changes. Dr. Likover also explained that epidural steroid injections are needed when there is objective evidence of a radi-cular nerve problem, and he did not see any evidence of radicular problems.
 

 Dr. Holladay disagreed with Dr. Berliner’s physical therapy prescription because it would be unlikely to improve the clinical outcomes, and a home exercise program would be just as effective. Dr. Holladay also thought that returning to work would be an effective form of physical therapy.
 

 The WCJ found that the treatment recommended by Dr. Berliner was reasonable and necessary under the circumstances. This finding was not manifestly erroneous.
 

 Nabors also complains about the WCJ’s finding that the urological referral was medically necessary. Dr. Ellis Kanaan thought that a urinary condition suffered by Whatley could be the result of a neuro-genic bladder related to his back injury, and that Whatley required a urological evaluation to exclude that possibility. This finding was also not manifestly erroneous.
 

 
 *263
 
 PENALTY-FAILURE TO TIMELY PAY MEDICAL BENEFITS
 

 The WCJ found that Nabors did not reasonably controvert the medical treatment recommended by Dr. Berliner, and assessed penalties |17totaling $8,000 pursuant to La. R.S. 23:1201(F). Among Dr. Berliner’s recommendations were a cervical epidural block, EMG of the upper extremities to document cervical radiculo-pathy, continuation of anti-inflammatories and other symptomatic medications, physical therapy, and the monitoring of What-ley’s progress after the injections.
 

 Requests were made in April 2007 for approval of MRIs requested by Dr. Donovan. It was clear the next month that Joseph Sarkies, the claims adjuster working on the case, was aware that Dr. Berliner wished to proceed with the diagnostic testing, including MRIs, that had been recommended by Dr. Donovan. On June 20, 2007, Nabors’ counsel wrote to Whatley’s counsel that the MRIs would not be paid for until they obtained the results of Dr. Likover’s evaluation. The MRI expenses were paid in November of 2007 after Dr. Holloday relied on them.
 

 On August 20, 2007, Whatley’s counsel demanded in writing that Nabors reimburse Whatley for past and future out-of-pocket payments for drugs prescribed by Dr. Berliner. Nabors’ counsel replied that payments for prescriptions would not be authorized until Dr. Holladay’s report was received and reviewed. It was also noted by Nabors’ counsel that Dr. Likover had released Whatley back to his full duty position as driller and had placed him at MMI.
 

 On October 25, 2007, Nabors’ counsel wrote that he was recommending that Na-bors deny prescription and mileage reimbursement requests in light of the opinions of Dr. Likover and Dr. Holladay.
 

 | ijjOn October 30, 2007, Whatley’s counsel made formal demand for approval of the nerve conduction studies recommended by Dr. Berliner. The next month, Nabors’ counsel replied that the request for nerve conduction studies would be denied in light of the opinions of Drs. Likover and Holla-day.
 

 Sarkies wrote to Dr. Berliner on February 25, 2008, to confirm authorization for one thoracic facet injection as recommended by Dr. Holladay in his September 4, 2007, report.
 

 On March 4, 2008, Nabors’ counsel wrote to Whatley’s counsel that he was advising Nabors to continue to deny demands for reimbursements of medications prescribed by Dr. Berliner until opinions were received from Drs. Holladay and Lik-over regarding the need for the medications. That same date, Dr. Likover wrote to Nabors’ counsel that he saw no medically necessary reason for Whatley to be prescribed a sleeping pill, muscle relaxant and narcotic pain medicine.
 

 On March 17, 2008, Whatley’s counsel wrote to Sarkies that he was requesting payment of mileage and reimbursement for out-of-pocket payments for prescription medication, and approval for physical therapy as recommended by Dr. Berliner.
 

 On March 20, 2008, Nabors’ counsel replied that he was going to recommend reimbursement for mileage associated with the injection procedure, but would recommend denial of reimbursement both for mileage associated with visiting Dr. Berliner at any other time and for reimbursement for out-of-pocket expenses associated with the prescribed 119medications. Na-bors’ position was that based upon the opinions of Drs. Likover and Holladay, Whatley did not require any further medical care other than the one set of facet injections. Nabors’ counsel stated he would confer with Drs. Holladay and Lik-
 
 *264
 
 over about the need for physical therapy and would not recommend payment until he heard from them.
 

 On March 25, 2008, Nabors’ counsel wrote to Whatley’s counsel that because Drs. Holladay and Likover opined that Whatley was at MMI and no longer in need of medical treatment, because they released him to return to work as a driller, and because Nabors would be willing to consider rehiring Whatley, he was no longer entitled to medical or indemnity benefits of any kind.
 

 On March 28, 2008, Dr. Holladay wrote to Nabors’ counsel that he disagreed with Dr. Berliner’s physical therapy prescription because physical therapy was unlikely to improve clinical outcomes, and a home exercise program was just as effective. Dr. Holladay also wrote that returning to work would be an effective form of physical therapy.
 

 On April 10, 2008, Dr. Holladay wrote to Nabors’ counsel that he had reviewed Dr. Berliner’s March 12, 2008, report, and that he did not agree with the recommendation of physical therapy and his original opinion and treatment plan had not changed.
 

 Whatley sustained serious injuries in the rig accident. Dr. Holladay originally did not believe that Whatley was at MMI for the T-spine and recommended the facet injections. Dr. Holladay did not state a change in 12nhis position until the February 2008 letter; yet, Nabors relied on his opinion prior to then to reject claims for various expenses.
 

 We cannot conclude that the WCJ abused his discretion in assessing an $8,000 penalty in this instance.
 

 ATTORNEY FEES AND LITIGATION EXPENSES
 

 We also find no abuse in discretion in the award of attorney fees and litigation expenses.
 

 DECREE
 

 At appellant’s cost, the judgment is AFFIRMED.
 

 [1]
 

 . Dr. Gabel also referred Whatley to Dr. Francisco Perez for a psychological consultation.
 

 [2]
 

 . An MRI of the right knee was done on April 7, 2007, on a referral by Dr. Donovan. The radiologist’s impressions were grade 2 sprain of the MCL, soft tissue contusion injury with some fluid in the medial aspect, slight joint effusion, patellofemoral disease with grade 2 chondromalacia patella, and no evidence of meniscal tear.
 

 [3]
 

 .Dr. Berliner largely agreed with Dr. Donovan’s impressions.
 

 [4]
 

 . Dr. Likover saw a mild bulge at C3-4 and mild bulges at nearly every level of the L-spine. He observed no herniation. Dr. Lik-over considered the MRIs to be normal or a little worse for a working man who was Whatley’s age.
 

 [5]
 

 . Dr. Holladay reasoned that the only evidence-based medical literature support for epidural steroid injections was for people with acute radiculopathy.
 

 [6]
 

 . Dr. Holladay did not consider Whatley to be disabled from doing any job at that time. He thoughl an FCE could determine what lower level physical jobs he could perform.