DREW, J.
_jjln this workers’ compensation proceeding, the Town of Rayville (“Rayville”) appeals a judgment ordering it to pay for an anterior cervical discectomy and fusion (“ACDF”) procedure for Robert O’Neal, who was injured in an work-related automobile accident while employed as a mechanic by Rayville.
We affirm.
FACTS
O’Neal had an extensive medical history involving his lower back. He began treating with Dr. John Ledbetter, a pain management doctor, in 2004. Dr. Ledbetter administered epidural steroid injections and nerve root block injections to O’Neal’s lower back.
Dr. Ledbetter referred O’Neal to Dr. Bernie McHugh, a neurosurgeon, in 2005. Dr. McHugh performed lumbar decom-pressions and laminectomies to alleviate O’Neal’s lower back symptoms. In 2007, Dr. McHugh performed a lumbar inter-body fusion on O’Neal.
O’Neal was involved in a non-work-related automobile accident (“first accident”) on April 23, 2009, when his vehicle was rear-ended. He went to the Emergency Room at St. Francis Medical Center for treatment. O’Neal complained of severe bilateral neck pain, pain radiating into his left shoulder and down his left arm, and numbness in his left index and middle fingers. The diagnosis was cervical strain. An X-ray of the cervical spine showed straightening of the normal cervical spine curvature, and degenerative disc disease at the C5-6 and C6-7 levels. There was no evidence of fracture or subluxation seen on the X-ray.
| ^Medical treatment following first accident
O’Neal was treated by his family doctor, Ralph Abraham, on May 5, 2009. He reported having been involved in the accident. O’Neal told Dr. Abraham that he was experiencing pain in his neck, left shoulder, upper left side, back and right hip. Dr. Abraham ordered X-rays of the cervical spine and left shoulder. The cervical spine X-ray showed moderate degenerative disc space narrowing and osteo-phyte formation at C5-6 and C6-7.
O’Neal called Dr. McHugh’s office on May 5 to report the accident and that he had gone to the Emergency Room with complaints of left shoulder pain and right leg pain. He reported that he continued to have left shoulder pain and increased pain in the right leg. Dr. McHugh ordered a lumbar spine MRI, which was done early the next month.
Dr. Douglas Brown, an orthopedic surgeon, examined O’Neal on May 15, 2009.[1] O’Neal said that he had aching, burning, and stabbing sensations in the left side of his neck, shoulder and arm down to the base of his index finger. O’Neal rated his pain as 10 out of 10. Dr. Brown’s impressions included preexisting degenerative disc disease at C4, C5, and C6; acute cervical strain with possible disc protrusion in view of the radicular pain; and left shoulder sprain with possible rotator cuff tear.
Dr. Brown ordered an MRI of the cervical spine, which was done on June 3, 2009.[2] *85 It showed degenerative disc and some arthritic changes in the mid and lower cervical spine. It also showed abnormalities at the C3-4, |3C5-6, and C6-7 levels representing disc herniation, worse on the left side, touching the nerve root and causing acquired spinal stenosis and probably accounting for some of O’Neal’s symptoms.
Dr. McHugh examined O’Neal’s lumbar spine on June 4, 2009. O’Neal did not mention neck or left arm complaints during that visit. Dr. McHugh recommended an evaluation by Dr. Ledbetter for possible injections.
Electro diagnostic testing ordered by Dr. Brown was performed on June 9, 2009. EMG analysis of the left upper extremity was normal, and there was no evidence of left cervical radiculopathy. A nerve conduction study of the left upper extremity was normal except for a delay in the median motor nerve consistent with median neuropathy or carpal tunnel syndrome.
Dr. Brown next examined O’Neal on June 10, 2009, at which time he complained of numbness and tingling in his left arm and right leg, which he thought were related to the first accident. Dr. Brown interpreted the June 3 MRI as showing left disc herniation at C3^4, C5-6, and C6-7, and preexisting arthritis at C5-6 and C6-7. His diagnosis was probable acute disc herniation at C3-4, and chronic disc herniation at C5-6 and C6-7, possibly aggravated by the accident. Dr. Brown also diagnosed a partial rotator cuff tear. Dr. Brown wanted a cervical myelogram and a CT scan performed in order to determine which disc levels were most involved and then to proceed with either treatment or a surgical recommendation.
l/The cervical myelogram and the CT scan were done on June 18. The myelo-gram showed a degenerative cervical spine at the predominantly C3-4 and C5-6 levels. The CT scan showed a degenerative cervical spine that was most severe at the C5 to C7 levels with possible cord compression on the left side. Additional multilevel central spinal canal stenosis and neural foramina narrowing were also shown.
Dr. Ledbetter treated O’Neal for the first time since 2006 on July 7, 2009. The chief complaints related by O’Neal were low back and right leg pain. O’Neal told Dr. Ledbetter about the automobile accident, and that he had left shoulder pain as well as an exacerbation of back and right leg pain. Dr. Ledbetter noted that Dr. Brown was treating the left shoulder. Dr. Ledbetter’s diagnosis was low back pain with right leg radiculopathy and pain exacerbation following the first accident. Dr. Ledbetter wanted to schedule transforami-nal epidural steroid injections of the lumbar spine.[3] There was no mention of the neck during this visit.

Medical treatment after second accident

On September 9, 2009, O’Neal was involved in an automobile accident (“second accident”) while driving to work. O’Neal’s work truck struck another vehicle while traveling at a speed of approximately 50 mph when the other vehicle ran a red light and crossed into its path. An airbag deployed during the collision and struck the side of O’Neal’s face.
O’Neal was transported by ambulance to the Emergency Room at Richardson Medical- Center. O’Neal complained to the EMT about back Rpain. The Emergency Room report showed that O’Neal’s chief complaints concerned his lower back and left side. O’Neal described lower back pain that was moderate. An X-ray of the lumbar spine was taken.
*86 Dr. Ledbetter treated O’Neal on September 17, 2009. O’Neal mentioned the second accident to him. It was noted that O’Neal had neck pain following the first accident, but it had not radiated into his arms. O’Neal reported that since the second accident, he had a lot of neck pain that was radiating into the left greater than the right arm. O’Neal rated his pain as 75 out of 100, and he said he was taking Lorcet more often. On examination, cervical range of motion was limited with rotation to the left. Rotation and tilt to the left produced sharp, shooting pains into the left arm. One of Dr. Ledbetter’s impressions was cerviealgia (generalized neck pain) with left upper extremity radicular complaints following the second accident. Dr. Ledbetter wanted an MRI of the cervical spine.
Dr. Brown examined O’Neal on September 28, 2009. Regarding his cervical spine, O’Neal reported having stabbing, pins and needles, and burning sensations in his neck and both arms.[4] He rated his pain as 10 out of 10. Dr. Brown recommended a lumbar MRI, which was done at the end of September. On October 7, 2009, Dr. Brown wrote to O’Neal’s attorney that he was returning O’Neal to Dr. McHugh for consideration of a posterior spinal fusion with decompression for the lower back. He was deferring all treatment to Dr. McHugh and discharging O’Neal from his care.
| c.O’Neal was treated by Dr. Ledbetter on October 15, 2009. O’Neal complained of cervical pain and left upper extremity pain. He said Lorcet was not effectively controlling his pain because his pain was more intense. He rated his pain as 7 out of 10. On examination, there was limitation in range of motion of the cervical spine. Rotation and tilt to the left produced sharp, shooting pain into the left upper extremity. Dr. Ledbetter’s impression continued to be cerviealgia with left upper extremity radiculopathy following the second accident.
Dr. Ledbetter ordered a cervical spine MRI, which was done on October 15. The MRI showed mild canal stenosis at C4-5 and moderate canal stenosis with mild anterior cord flattening at C3-4; moderate to high grade canal stenosis with moderate cord flattening at C5-6; high grade canal stenosis with prominent cord flattening at C6-7, greater on the left; and bilateral foraminal stenosis at C3-4, C4-5, C5-6, and, greater on the left, at C6-7.
Dr. McHugh examined O’Neal on October 20, 2009. O’Neal complained about having severe cervical pain, muscle spasm, and right lower extremity symptoms since the second accident. Dr. McHugh examined the MRI from five days earlier and noted high grade stenosis at C5-6 and C6-7. He also noted disc herniation at both levels, left greater than right, which correlated with O’Neal’s symptoms. Dr. McHugh wanted to schedule an ACDF at C5-6 and C6-7. O’Neal returned to Dr. McHugh’s office nine days later, when he again reported feeling severe cervical pain since the second accident.
|7Q’Neal was treated by Dr. Abraham on December 11, 2009, for worsening lower back pain that radiated down into his legs.
O’Neal was seen at Dr. Ledbetter’s office on December 17, 2009. He rated his pain as 100 out of 100. Dr. Ledbetter’s impressions included cerviealgia with left upper extremity radiculopathy following the second accident, as well as MRI evidence of cervical intervertebral disc disease and high-grade stenosis at multiple levels with cord flattening at C6-7, greater *87 on the left. A Duragesic pain patch was added to O’Neal’s medications.
Dr. Ledbetter examined O’Neal on December 31, 2009. O’Neal reported some relief from the patch, but he continued to have constant pain in the cervical region with left, greater than right, radiculopathy. He added that the pain in his upper extremities was so severe that the numb and tingling sensation was constantly radiating down into the ring and pinky fingers of both hands. On examination, flexion and extension exacerbated his cervical pain. Dr. Ledbetter recommended that cervical surgery be done as soon as possible because the pain was so intense. Dr. Led-better’s impressions included cervicalgia with bilateral upper extremity radiculopa-thy since the second accident. O’Neal reported that he had had no cervical problems prior to the second accident.
O’Neal continued to complain of neck and bilateral arm pain to Dr. Ledbetter on January 28, 2010. O’Neal rated his pain as 100 out of 100. Dr. Ledbetter’s impressions included cervicalgia with bilateral upper extremity radiculopathy since the second accident with no reported cervical problems prior to the accident.
IsDr. Ledbetter again examined O’Neal on February 26, 2010. The chief complaint was neck pain with pain radiating into both arms, sometimes more pronounced on the left than the right. O’Neal said the pain was a little worse on the right that day, with intermittent numbness in the last three fingers of the right hand. He rated his pain as 10 out of 10. Among Dr. Ledbetter’s impressions that day was cervicalgia with bilateral upper extremity radiculopathy following the second accident, with inception of current pain after the second accident.
Dr. Ledbetter treated O’Neal on March 26, 2010, for continued neck pain that radiated down into his arms. He noted that O’Neal had known cervical spinal stenosis but was asymptomatic prior to the second accident. Rotation of his head to the right elicited dysesthetic right arm pain. Dr. Ledbetter thought the ACDF should be done immediately.
O’Neal complained of neck pain with pain radiating into both arms when treated at Dr. Ledbetter’s office on April 27, 2010. Dr. Ledbetter continued to recommend an ACDF to address the ongoing neck and upper extremity radiculopathy; he noted that the pain came from the second accident. O’Neal rated his pain as 8 to 9 out of 10. Dr. Ledbetter’s impressions included cervicalgia with cervical intervertebral disc disease and upper extremity radiculo-pathy.
O’Neal called Dr. Ledbetter’s office on May 6, 2010, to complain about the pain in his neck and right arm. He said he could not stand the pain much longer and that his pain medications were not helping.
IsA cervical spine X-ray ordered by Dr. Abraham was taken on May 10, 2010. The X-ray showed cervical spondylosis with degenerative disc space narrowing and anterior and posterior osteophytes, most pronounced at C3-4, C5-6, and C6-7. Dr. Abraham treated O’Neal on May 14 for lower back pain.
Dr. McHugh examined O’Neal on June 1, 2010; O’Neal reported having continued severe pain in his cervical spine and bilateral upper extremities. Dr. McHugh noted that O’Neal began reporting severe cervical pain after the second accident. Dr. McHugh also continued to follow his lumbar spine.
O’Neal still had neck and right arm pain when Dr. Ledbetter examined him on June 25, 2010. He rated his pain as 10 out of 10. Dr. Ledbetter thought O’Neal would benefit from a spinal cord stimulator to treat his lumbosacral radiculopathy, but he *88 believed the cervical problem was more urgent. Dr. Ledbetter’s impression was cervical disc disease with right cervical radiculitis. Dr. Ledbetter increased his OxyContin dosage.
When Dr. Ledbetter examined O’Neal on July 22, 2010, O’Neal complained of ongoing sharp aching pain in the neck that radiated down into the left shoulder and right arm into the hand. He told Dr. Ledbetter that-he experienced minimal improvement from the increased OxyContin, and he registered his pain as being 10 out of 10. Dr. Ledbetter’s impression was cervical spinal stenosis with cervical radi-culopathy.
O’Neal related that he continued to have quite a bit of neck pain with radiation into the arms, particularly the right forearm, when Dr. Ledbetter |10treated him on August 19, 2010. O’Neal said he had throbbing pain in that forearm at night, and he had a lot of axial neck and shoulder pain during the day. He rated his pain as 10 out of 10. His OxyContin dosage was increased to allow him to continue working. Dr. Ledbetter’s impressions included severe cervical disc disease with high-grade stenosis at two levels, and cervical radiculitis.
On September 21, 2010, O’Neal was treated at Dr. Ledbetter’s office. His chief complaint continued to be neck pain and pain radiating toward both arms, more significant on the right. Dr. Ledbetter’s impressions included severe cervical inter-vertebral disc disease with high-grade stenosis at two levels, and upper extremity radiculopathy.
Dr. Abraham treated O’Neal on October 11, 2010. O’Neal complained of pain all over, and that his arms were swollen.
O’Neal returned to Dr. Ledbetter’s office on October 19, 2010, with complaints of ongoing sharp, aching neck pain that radiated into both shoulders and upper arms. He rated his pain as 10 out of 10.
O’Neal was next examined at Dr. Led-better’s office on November 19, 2010, when his chief complaints were neck and bilateral arm pain. He said his pain was 9 out of 10. O’Neal’s chief complains were again neck pain and bilateral arm pain when Dr. Ledbetter treated him on December 17, 2010. His pain was considered significant, and he rated it as 9 out of 10. Dr. Ledbet-ter’s impressions included cervical radiculi-tis, cervical spondylosis without myelopa-thy, and cervical intervertebral disc with myelopathy.
|nOn January 14, 2011, Dr. Ledbetter’s office treated O’Neal for his ongoing neck pain. Dr. Ledbetter next examined O’Neal on February 11, 2011. O’Neal’s chief complaint was neck pain with pain radiating toward both shoulders and down into the right arm and hand. He said his pain was 8 out of 10, but was reduced by his medications. Dr. Ledbetter’s impressions included cervical radiculitis, and cervical spondylosis without myelopathy. O’Neal rated his pain as 10 out of 10 when he was seen at Dr. Ledbetter’s office on March 8, 2011.
O’Neal continued to report severe cervical pain as well as numbness and tingling in his right hand when Dr. McHugh examined him on April 14, 2011.

Procedural history

O’Neal filed his disputed claim for compensation on May 3, 2010. He sought an ACDF at C5-6 and C6-7 as recommended by Dr. McHugh. A trial was held on the issue of whether the second accident made the ACDF medically necessary. The WCJ heard testimony from O’Neal, who was fired by Rayville in May of 2010 and was working as a mechanic at a tire store at *89 the time of trial.[5] Depositions from Drs. Ledbetter, Brown, McHugh, and Donald Smith, a second medical opinion physician, were filed into evidence along with O’Neal’s medical records.
The WCJ ordered Rayville to pay for the ACDF. Rayville appealed, arguing that the ACDF was necessary prior to the second accident.
| ^DISCUSSION
Factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551; Dombrowski v. Patterson-UTI Drilling Co., 46,249 (La.App.2d Cir.4/13/11), 63 So.3d 308. To reverse a factfinder’s determination under this standard of review, an appellate court must undertake a two-part inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact; and (2) the court must further determine that the record establishes that the finding is clearly wrong. Stobart v. State through Dept. of Transp. & Dev., 617 So.2d 880 (La.1993); Dombrowski v. Patterson-UTI Drilling Co., supra.
Ultimately, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Stobart v. State through Dept. of Transp. & Dev., supra; Dombrowski v. Patterson-UTI Drilling Co., supra.
Under La. R.S. 23:1203, medical payments are separate and distinct from compensation indemnity benefits. An employer shall furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any non-medical treatment recognized by the laws of this state 113as legal. La. R.S. 23:1203(A). A workers’ compensation claimant must prove that the medical expenses are reasonably necessary for the treatment of a medical condition caused by a work-related injury. Pardee v. Forest Haven Nursing Home, 42, 321 (La.App.2d Cir.6/20/07) 960 So.2d 1216. The claimant must prove the necessity of the treatment and the causal connection between the treatment and the employment-related accident by a preponderance of the evidence. Read v. Pel-State Oil Co., 44,218 (La.App.2d Cir.5/20/09), 13 So.3d 1191; Whatley v. Nabors Drilling USA, LP, 44,720 (La.App.2d Cir.11/12/09), 26 So.3d 253.
A WCJ’s determination with regard to medical necessity is entitled to great weight and will not be disturbed on appeal in the absence of manifest error or unless clearly wrong. Whatley v. Nabors Drilling USA, LP, supra.
 A preexisting medical condition will not bar an employee from recovery if the employee establishes that the work-related accident aggravated, accelerated or combined with the condition to cause the disability for which compensation is claimed. Peveto v. WHC Contractors, 93-1402 (La.1/14/94), 630 So.2d 689; Hatfield v. Amethyst Const., Inc., 43,588 (La.App.2d Cir.12/3/08), 999 So.2d 133, writ denied, 2008-2996 (La.2/13/09), 999 So.2d 1150. The preexisting condition is presumed to have been aggravated by the accident if the employee proves: (1) the *90 disabling symptoms did not exist before the accident, (2) commencing with the accident, the disabling symptoms appeared and manifested themselves thereafter, and (3) either medical or circumstantial evidence indicates a reasonable possibility of a causal connection between the accident and the 114activation of the disabling condition. Peveto, supra; Green v. Thompson Home Health, 46,593 (La.App.2d Cir.9/21/11), 73 So.3d 490, writ denied, 2011-2460 (La.1/20/12), 78 So.3d 143.

Dr. Donald Smith

Dr. Smith, who specialized in neurosurgery and did mostly spinal surgeries, gave a second medical opinion.
He evaluated O’Neal on October 25, 2012. Dr. Smith was provided with the film of the MRI from October of 2009 to review. In his report, he noted that O’Neal’s chief complaint was sharp needle pain on both sides of his neck that radiated down to his arm causing numbness in his fingers. Dr. Smith’s impression was degenerative cervical disc disease at multiple levels with significant defects at C5-6 and C6-7, and with encroachment on the spinal canal and significant cord compression at C6-7. Dr. Smith believed the cervical spine showed degenerative changes at multiple levels with characteristics suggesting chronic longstanding degenerative disease. He wrote in his report that he could not state with certainty whether the disease process was aggravated by the second accident.
Dr. Smith explained that what he meant by significant defects at C5-6 and C6-7 was he thought there were osteophytes that were significantly constricting the spinal canal and compressing the spinal cord. He believed that the degenerative disease and spondylosis was a long-term, chronic, gradual process instead of being produced by the second accident. He thought the degenerative disease had been longstanding when he looked at the October 2009 MRI, which was performed a month after the accident. J^The osteophytes could not have developed in a month, as osteophytes of that nature take many months and probably years to develop.
Dr. Smith added that the fact that he could not state with certainty whether the accident produced an aggravation meant that some additional aggravation may have occurred, but he felt very sure that the basic pathology was present long before the accident. The October MRI could only tell him the spondylosis and osteophytes developed over a long time. It could not tell him whether O’Neal had symptoms before the accident, or if the symptoms were all produced after the accident.
Dr. Smith stated that if the entire process was due to a long-term development and no new structural injury occurred to the neck at the time of the second accident, then he would expect for the MRIs six months to a year later to be almost unchanged from the October 2009 one he reviewed.
An addendum report was issued by Dr. Smith after he was provided with the MRI and cervical myelogram from June of 2009. He concluded that there was no significant difference between the two MRIs. The myelogram confirmed the presence of degenerative changes at multiple levels in the cervical spine. Osteophytes were particularly prominent at the C5-6 and C6-7 levels, with a large osteophyte on the left at the C6-7 level.
Dr. Smith was asked by the risk manager for Rayville if O’Neal needed the same cervical surgery prior to the second accident. His written response in December of 2010 was:
[ O’Neal] has chronic degenerative cervical disc disease, and spondylosis with *91 significant defects, especially at C6-C7. Certainly, this disease process often does progress to the point of requiring surgical treatment with or without any maj or [1fiinter current episodes of injury. Whether or not the patient needs surgery at any particular time is related to the level of symptomatology, and physical findings. [O’Neal] does not have any objective evidence of cervical myelopa-thy nor other changes that would lead me to state that surgical treatment even at the present time is mandatory. The indications for surgery, if such is required, would be to level the patient’s pain, and symptoms. Again, the indications for such intervention would depend more on these symptoms rather than merely the appearance of the radio-graphic studies.
Dr. Smith explained in his deposition that when he referred to symptoms in that response, he was not referring to pain or discomfort, but instead symptoms related to the functional aspects of the spinal cord. He added that pain is rarely directly associated with the functional components, and that myelopathy is sometimes painless.
There was no clinical finding of spinal cord dysfunction or myelopathy when he evaluated O’Neal, so Dr. Smith did not think that surgery was emergency or mandatory, but he still felt that surgical intervention would probably be required at some point. Although there was significant narrowing of the spinal canal, he did not see any physical findings on exam that would tell him that O’Neal’s spinal cord was beginning to lose function.
Dr. Smith’s opinion was that the MRIs showed enough impingement or narrowing of the spinal cord to require surgery eventually, and that was present on the MRI done before the second accident. Dr. Smith believed the ACDF would be an acceptable form of surgery for O’Neal, although there were other methods of decompressing and getting rid of the osteo-phytes. Dr. Smith did not feel that any cervical surgery was required at the time he evaluated O’Neal.
117Pr. Smith believed that he would have recommended cervical intervention at the time he examined O’Neal if he had been his treating neurosurgeon. He would have suggested that the surgery take place within a few months because there was some risk to the spinal cord because of the degree of compression.
Dr. Smith said that O’Neal would probably start developing some spinal cord loss if he never had the surgery. However, O’Neal may have started to develop spinal cord loss even without the September accident, as the disease can produce myelopathy even without trauma. O’Neal’s cervical spondylosis itself would require surgery soon with or without an accident.
Dr. Smith’s opinion was that the need for cervical surgery would have been the same even without the September 2009 accident. The pain and risks to the spinal cord are basically related to the spondylo-sis and narrowing that developed from the process, not from the accident. The September accident did not appear to worsen his condition.
Some of the crucial physical findings would have been there when Dr. Smith examined him if they had already developed, and they would not have waxed and waned with the level of pain symptoms. The decision about the timing of surgery hinged more on the spinal cord function than on pain complaints, although Dr. Smith acknowledged that numbness and tingling down the arms could be a sign of myelopathy.
Dr. Smith was asked about O’Neal’s complaints on September 2S, 2009. He *92 said that the symptoms of bilateral pain in the arms could have|18been an early symptom of myelopathy, but the symptoms were also suggestive of nerve root involvement.
Dr. Smith testified that most of the time spondylosis develops on both sides of the spinal canal, so degenerative changes tend to be more symmetrical, but that is not always the case and they can sometimes be more severe on one side and then progress to the other side. If the left side pain became left side and right side pain immediately after the September accident, he would presume that there may have been some aggravation.
In conclusion, Dr. Smith agreed that O’Neal is going to need surgery. His cervical condition of worsening pain and symptoms could have occurred from a natural progression of the degenerative disease without the intervening accident. However, O’Neal was at an increased risk of aggravation from an accident because of his condition when compared to someone with a normal spinal canal.

Dr. Doug Brown

Dr. Brown, an orthopedic surgeon, wanted to treat O’Neal with physical therapy and conservative treatment in June 2009, and thought he should leave it up to Dr. McHugh to prescribe any ongoing treatment. O’Neal was eager to get something more done, which to Dr. Brown indicated that he wanted surgery. Dr. Brown wanted to see a cervical CT scan and myelo-gram before he would discuss treatment of the cervical spine, including a possible surgical solution to O’Neal’s pain. The mye-logram showed actual pressure on the spinal cord itself at C5-6 and |19C6-7, which placed him at risk of spinal cord injury with almost any twisting, jerking, or extension of his neck.
When he examined O’Neal on September 28, 2009, Dr. Brown was primarily concerned with his lumbar spine, which was why he ordered a lumbar MRI and not a cervical one. He prescribed a mild Tylenol medicine with a muscle relaxant mixed with it.
Dr. Brown did not see any real changes, either in the reports or in the actual films, between the June 3, 2009, and October 15, 2009, MRIs. It did not appear to Dr. Brown that the cervical spine as shown on the MRIs was worse following the second accident. He believed that the conditions that Dr. McHugh was going to repair were present in June of 2009. When he compared the June and October 2009 cervical MRI films and the myelogram, he believed that there was no worsening of O’Neal’s condition following the second accident.
Dr. Brown never recommended cervical surgery to O’Neal. He explained that the ACDF opens the neural foramina to straighten the spine, remove bone spurs and ruptured discs at specific levels, and fuse or stiffen the spine. It is done to correct neural foramina narrowing and any impingement or compression based upon disc material.
He agreed with Dr. McHugh’s recommendation for the ACDF at C5-6 and C6-7, but he felt that the conditions requiring the surgery existed before the second accident. Those conditions were the stenosis and the foraminal narrowing; the osteo-phytes also played a role. Dr. Brown explained that osteophytes take a minimum of six months to develop, and more likely 180years. He also explained that degenerative disc disease takes years to develop.
Dr. Brown agreed that O’Neal’s symptoms were more varied after the second accident, but he disagreed that they were more severe as O’Neal had rated his pain as 10 out of 10 during the May 2009 examination.
*93 When Dr. Brown was asked if the second accident caused aggravation of his cervical degenerative condition that resulted in the additional symptoms, he replied that it certainly caused him additional symptoms. He added that the second accident may have tipped O’Neal over the edge.
Dr. Brown agreed that the mere fact that the objective findings remained unchanged did not mean that his symptoms could not have been aggravated by the second accident.
Dr. Brown testified that there was no way to tell whether additional symptoms were caused by the second accident or by a progression of his cervical spine condition. He also thought it was more probable than not that O’Neal would have required the surgery even if the new symptoms had never materialized. Dr. Brown thought cervical treatment was necessary in June of 2009, which was why he sought the CT scan and my-elogram. He would have recommended the ACDF in June of 2009 based upon the myelogram.
Dr. Brown agreed that the necessity for a surgery is based upon objective findings, condition of the spine, and symptomatolo-gy. He also |¾1 acknowledged that he had not decided on cervical surgery at the time O’Neal left his care.
Dr. Brown agreed that it was more probable than not that the second accident aggravated his preexisting condition. Nevertheless, the left-side symptoms that O’Neal complained about in May and June 2009 alone would have been enough to warrant cervical surgery.

Dr. Curtis Partington

Dr. Partington examined the June and October 2009 cervical MRIs and the June 2009 myelogram. He found that there had been no significant change in the appearance of the cervical spine between the three exams. O’Neal had -severe cervical spondylosis with disc bulging and osteo-phytes compressing his nerve roots and his spinal cord at multiple levels. Dr. Part-ington concluded that there was no change in the appearance of the exams to suggest that this accident further injured O’Neal’s cervical spine.

Dr. John Ledbetter

Dr. Ledbetter was engaged in the practice of pain management. He was focused on treating O’Neal’s lower back in July of 2009. He would have noted it if O’Neal had been complaining of arm or neck pain at that time. Dr. Brown was treating the left shoulder at the time.
Based upon the increase in symptoms, Dr. Ledbetter thought it was more probable than not that the second accident exacerbated O’Neal’s preexisting cervical condition and caused bilateral arm pain and more neck pain.
laaDr. Ledbetter agreed that symptoma-tology, along with the MRI findings, was a factor in determining whether surgery was necessary. Dr. Ledbetter did not recommend cervical spine surgery on September 17, 2009, because he did not know how bad O’Neal’s cervical spine condition was at the time. He suspected there was a significant issue, which was why he ordered the cervical MRI.
Dr. Ledbetter stated that someone with significant cervical spinal stenosis would be predisposed to having symptoms exacerbated in an accident during which the airbag hits him in the face. Dr. Ledbetter explained that the fact that the arm pain became bilateral and more severe after the accident indicated that there was probably an aggravation of his preexisting condition. Dr. Ledbetter noted that O’Neal had hardly talked about his low back since the September 2009 accident, despite it being the focus of his care prior to that accident.
*94 After Dr. Ledbetter treated O’Neal on December 17, 2009, he called Dr. McHugh’s office because Dr. Ledbetter was concerned about the severity of the stenosis after seeing the MRI and he felt O’Neal was beyond his help.
Dr. Ledbetter believed that cervical surgery became medically necessary after the second accident because of the increased symptoms. He never considered it prior to the second accident, but he acknowledged not seeing a cervical MRI taken before the second accident. He also did not know that Dr. Brown had ordered a cervical MRI in May of 2009. His |Msurgery recommendation was based upon how O’Neal’s symptoms had progressed.
Dr. Ledbetter acknowledged that Dr. Brown probably would have recommended surgery before the second accident based on the MRI and left arm pain. He would defer to Dr. Brown since he was the one who saw him at the time.
Dr. Ledbetter felt there was no need to order a cervical MRI prior to the second accident because O’Neal had not been complaining about his neck. Dr. Ledbet-ter would not operate on someone who is not even reporting a level of pain that merited an MRI. O’Neal complained of enough pain after the second accident to warrant the surgery. In Dr. Ledbetter’s opinion, based upon the clinical presentation that was markedly different, O’Neal went from a “maybe, maybe not” before the second accident, to a “let’s do it tomorrow” following it.
O’Neal never mentioned having cervical pain during the visit in July of 2009. O’Neal told him in December of 2009 that he had had no cervical problems prior to the car accident; he said the same thing on January 28, 2010. It was a little odd to Dr. Ledbetter that O’Neal never mentioned previously having cervical pain at those times. He also thought it was a little odd that O’Neal did not mention getting a cervical MRI in June of 2009 when he saw O’Neal on October 15, 2009.
Based upon O’Neal’s symptoms prior to the second accident, and the MRI, CT scan, and myelogram results, Dr. Ledbet-ter thought O’Neal was | ^potentially a candidate for cervical epidural steroid injections and not necessarily surgery before the second accident.
O’Neal may have needed surgery prior to the second accident, but his pain then may have been relieved by more conservative measures. While surgery before the second accident may have been appropriate, so was more conservative treatment like an epidural steroid injection. In Dr. Ledbetter’s opinion, the myelogram/CT scan reports suggested there may have been room for more conservative treatment based on clinical presentation. After the second accident, an epidural steroid injection was no longer appropriate.
Dr. Ledbetter felt that O’Neal clearly became a surgical candidate when he began exhibiting severe neuropathic shooting, burning pain down both arms, and when they had the results of the October 2009 MRI of the cervical spine. While there was still room for conservative treatment prior to the second accident, there was not room after the second accident if O’Neal’s reporting of the severity of his pain was believed.
Dr. Ledbetter thought it was significant that O’Neal was not complaining about his neck when he saw him in July of 2009. He agreed that O’Neal probably did not mention neck pain to him on that date because it was not really hurting him at the time.
Dr. Ledbetter agreed that there is a difference between an opinion on the necessity of surgery from him and an opinion from a neurosurgeon. He would defer to *95 Drs. Brown and McHugh on the severity of the stenosis and the surgical problem.

|gfiDr. Bernie McHugh

Dr. McHugh was a neurosurgeon who originally treated O’Neal’s lower back beginning in 2005. He began recommending the ACDF in October of 2009 because O’Neal was symptomatic clinically, and because the severity of his stenosis caused spinal cord compression and placed him at increased risk of additional spinal cord issues. The stenosis was being caused by a combination of degenerative disc disease, spondylosis, and bone spurs. Dr. McHugh looked at the film of the October 2009 MRI before making the ACDF recommendation.
Dr. McHugh was questioned about Dr. Brown’s position that he thought a cervical ACDF would have been necessary even before the second accident in light of the test results and the problems that O’Neal was experiencing. He responded that sometimes the studies are not as significant if the person is not symptomatic. O’Neal probably had the preexisting condition, but was asymptomatic, and surgeons do not necessarily operate on people who are asymptomatic. He would rather treat them conservatively. Dr. McHugh added that it was not an easy question to answer.
Dr. McHugh would have recommended an ACDF after the first accident if he thought the symptoms warranted it. O’Neal never complained to Dr. McHugh about severe cervical pain prior to the second accident. In contrast, the symptoms that manifested themselves after the second accident were serious enough to warrant surgery.
RfiO’Neal complained of aching, burning, and stabbing sensations in the left side of his neck, shoulder and arm down to the base of his index finger when he saw Dr. Brown on May 15, 2009. Based on that report, Dr. McHugh agreed that O’Neal was symptomatic in the cervical spine before the second accident. When Dr. McHugh was then asked if he had an opinion as to whether or not the ACDF was needed prior to the second accident, he said he could not render an opinion on that question because he did not know if O’Neal had been treated conservatively at the time for his symptoms.
Dr. McHugh was asked if O’Neal was no longer complaining of such severe pain to Dr. Brown on June 10, 2009, did that dictate against surgery at that time. He responded that a doctor wants to be as conservative as possible, and he did not know what conservative treatment O’Neal was getting from his other doctors for any neck and left arm symptoms.
According to Dr. McHugh, O’Neal had some shoulder complaints before the second accident, but it was after the second accident that he became more focused and clinically symptomatic regarding his neck and arm.
The radiographic findings coupled with the symptoms reported after the second accident warranted the ACDF and made it medically necessary. Dr. McHugh did not determine that surgery was medically necessary before the second accident because O’Neal’s earlier symptoms were not as severe as they were after the September accident. If O’Neal had earlier exhibited 127the symptoms that he had after the second accident, then Dr. McHugh would have recommended an ACDF earlier.
The symptoms that O’Neal reported to Dr. Ledbetter and Dr. Brown following the second accident indicated there was some aggravation of a preexisting cervical degenerative condition. It was not unusual, based on the dynamics of the second accident, for someone with O’Neal’s preexisting cervical condition to sustain an aggravation of that condition. It was more *96 probable than not that the second accident caused an aggravation of his preexisting condition:
Dr. McHugh thought it was more probable than not that the ACDF did not become medically necessary until O’Neal’s cervical pain became severe and bilateral in nature. He exhausts all conservative treatments before recommending surgery.

Aggravation of the preexisting degenerative condition

The medical records showed that O’Neal’s cervical symptoms mostly resolved following the first accident before they became considerably varied and worsened following the second accident.
O’Neal complained of bilateral neck pain and pain radiating into his left arm immediately following the first accident. O’Neal reported aching, burning, and stabbing sensations in the left side of his neck, shoulder, and down his left arm when examined by Dr. Brown on May 15, 2009.
O’Neal had no neck or arm complaints when Dr. McHugh treated him on June 4, 2009. Dr. McHugh was treating his lumbar spine at the time.
UsO’Neal complained of numbness and tingling in his left arm when Dr. Brown treated him on June 10, 2009. That is a stark difference from the pain he reported a month earlier. Dr. Brown had an inkling that surgery was possibly needed at the time, but other treatment was then still a possibility.
There was no mention of any neck pain when Dr. Ledbetter treated O’Neal on July 7, 2009. The focus was on the lower back during that visit. O’Neal had appointments scheduled with Dr. Brown on August 19 and 26, 2009, but he missed one and rescheduled the other because he felt his pain was no longer as severe and his symptoms were going away.
Things changed quickly following the second accident.[6] The symptoms became different and more severe. O’Neal began reporting pain radiating into both arms instead of just one arm, and he rated his pain as being high more than a year after the second accident. O’Neal testified that his neck hurts all the time, and he experiences stabbing, burning pain that shoots all the way down to his fingers. He is in pain every day and the pain in his right arm is constant while he is awake. His left arm hurts at times, but it is mostly his neck and right arm that bother him. Dr. Ledbetter has adjusted his medications to account for the pain. One thing that is telling is that following the second accident, focus has shifted away from the lumbar spine and to the cervical spine.
The ACDF surgery became medically necessary following the second accident which caused an aggravation of O’Neal’s preexisting degenerative condition in his cervical spine. Based upon our review of the record, we | ^conclude that the WCJ was not clearly wrong in ordering Rayville to pay for the surgery.
DECREE
The judgment is AFFIRMED.

. Dr. Brown had treated one of O'Neal's knees many years earlier.

. An MRI of the left shoulder ordered by Dr. Brown was also done on that date.

. These injections were done by Dr. Ledbetter in July and August of 2009.

. He also complained of pain in his lower back and right leg.

. O’Neal said he was doing light-duty work at the tire store.

. O’Neal explained that the reason the Emergency Room report after the second accident did not mention complaints of neck pain was because he was hurting all over.